UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------- X

T.P. and S.P., on behalf of S.P.,

                         Plaintiffs,

      v.

MAMARONECK UNION FREE
SCHOOL DISTRICT,

                       Defendant.
-------------------------------------------------------- X

                                   06 CIV 0509 (CLB)

                                   ***Memorandum and Order***

Brieant, J.

      Before the Court is an action initiated under the Individuals with Disabilities in

Education Act, 20 U.S.C. §1400 *et. seq*. ("IDEA").  Plaintiffs filed a motion (Doc. No. 15) for a

"modified *de novo* review" and summary judgment reversing the underlying administrative

decision of the State Review Officer ("SRO"), which affirmed the decision the Impartial Hearing

Officer ("IHO").  Defendant ("District" or "School") also moves for summary judgment (Doc.

No. 12).  The administrative record on appeal was received by the Court in February 2007.


      The June 26, 2005, administrative decision of IHO Christine Moore and the September

29, 2005 decision of the SRO Paul F. Kelly held that the Individualized Education Plan ("IEP")

implemented for Plaintiffs' child, S.P. (the "child") for the 2004-2005 school year was

reasonably calculated to provide the child with a free and appropriate public education

("FAPE").  Plaintiffs claim that the District failed both procedurally and substantively to provide

the child with a FAPE, that the supplemental Applied Behavioral Analysis ("ABA") services and

speech services that petitioners secured for the child were appropriate and reasonably calculated

to provide the child with a meaningful benefit, and that there are no compelling equitable circumstances sufficient to preclude or diminish a reimbursement award.  Plaintiffs claim *inter alia* that the District engaged in impermissible predetermination because "the most important aspects of [the child's] IEP were, for all intent and purposes, a 'done deal' when [his] parents walked into the IEP meeting room,"  that "no amount of participation by [his] parents could have changed a thing," and that the Parents were accordingly deprived of the right to meaningful participation in the IEP development.

Plaintiffs' minor child, S.P., was born August 21, 1998, and is now approximately 8 years old.  In November 2000, at age two, he was diagnosed by the McCarton Center for Developmental Pediatrics, with a "pervasive development disorder, not otherwise specified" ("PDD-NOS"), and at age four he was additionally diagnosed with an auditory processing disorder, fine and gross motor delays and an expressive and receptive language disorder.  The child's current classification by the Committee on Special Education ("CSE") as "autistic" is not in dispute.

In his preschool year, the child received 40 hours of ABA, which included 20 hours of 1:1 discrete trial training, and attendance in a preschool accompanied by a special education itinerant teacher (SEIT) for 12½ hours per week.  He also received speech-language therapy and occupational therapy ("OT").  *SRO at 1-2*.

For the 2003-2004 school year the child was referred to the District's CSE, which

recommended placement in a non-integrated 8:1+2 special kindergarten class, and afternoon mainstreaming with a 1:1 aide, as well as some speech-language therapy and OT.  The parents disagreed with the CSE recommendations and the parties entered into a settlement agreement, the terms of which are not part of the record in this case, but the child apparently received 30-35 hours of ABA therapy per week at home; 5 hours of ABA supervision per week; speech language therapy four times per week; and occupational therapy two times per week.  The child also attended a regular education preschool class with a full time 1:1 behaviorally-trained teacher for 10 hours per week.  *SRO at 2.*

The CSE convened for a review of the child's program in January 2004, at which time the child was reported as demonstrating progress in interacting with peers and making progress in language use, although the ABA service provider noted that the child was scripting at a high frequency throughout the day.  Scripting was defined by the use of perseverative language not on topic with the language occurring at that time in the environment, for example, language from television shows used as a calming or an avoidance technique.  *SRO at 2.*

During the summer of 2004, the child attended a special education camp for a few hours a day and also received 30 hours of ABA therapy per week; occupational therapy three times per week; and speech therapy five times per week.  *See IHO at 7.*

In May and June of 2004, the Child was reevaluated by the McCarton Center, which recommended, *inter alia*, that the child receive: ABA 1:1 services at least 25 hours per week at

3

home; 2 hours per week of parent training with an ABA specialist, at least 3 hours per week of ABA supervision, individual speech-language therapy five times per week; individual occupational therapy five times per week; and enrollment in a structured, language-based special education kindergarten class with a behaviorally trained aide and low student to teacher ratio. *See Dist. Exh. 9.*

In May and June of 2004, several District consultants also conducted evaluations:  Susan Varsames Young, M.A..Ed, conducted an Education Evaluation ; Lisa Barone Kovac, M.A., CCC, SLP, conducted a Speech and Language Evaluation on May 3, 2004; Michael Fox, PhD., conducted a Psychological and Educational Evaluation on June 3, 2004; Jill Greenberg, OTR/L, conducted an Annual Review and Related Service Report Occupational Therapy Report.

The "Speech and Language Evaluation" dated May 3, 2004, reported that since the child was originally evaluated by Dr. McCarton at the age of two and given the diagnosis of PDD-NOS, he had been receiving speech/language therapy since August 2002 from Diane Happas as part of a home-based program, focusing on the child's deficits in play,  socialization and communication skills.  The District's consultant recommended placement in a small structured special education class with children of similar needs, but thought that the child did not need the intensive instructional services typically provided to children with autism, despite noting, *inter alia*, that he had delays in auditory processing; that if there were auditory or internal distractions, the child needed repeated directions or gestural prompts; and that his expressive language was limited and included scripting.

The District's June 2004 evaluator found that the child's cognitive potential was not known, and that his use of verbal reasoning was minimal.  He was found to require a good deal of external direction for the performance of tasks, but exhibited average number knowledge and his letter and work recognition skills were in the high average range.  The evaluator recommended that the child would benefit from a small group kindergarten placement.

A language therapy summary was also conducted in June 2004 by the child's private speech-language therapist.  The therapist noted advancements in the child's word utterances and ability to sustain play interactions.  The therapist recommended placement in a special education kindergarten class that targeted among other goals, social and communication skills.

The District's CSE convened on June 11, 2004 for an annual review and recommended an IEP, which included placement in a 12:1+2 special class; 30 minutes of group speech therapy three times per week; 30 minutes of individual OT two times per week; 30 minutes of individual speech therapy one time per week; access to a slant board, and adaptive seating.

At the request of the Parents, the CSE reconvened on July 16, 2004, with the stated purpose to review the McCarton evaluation, and other information.  The parents there expressed concern for the child's transition from a 1:1 program to a full-day school program, and requested: a 1:1 full-time aide for the child; an extended day of service after school; and permission for the ABA home instructor to be able to accompany him to school for part of the day.

By letter dated August 25, 2004, Parents notified the District that it had not yet offered their son an education plan and placement for the 2004-2005 school year and that they would be providing him with an appropriate placement and seeking reimbursement.  By letter dated September 2, 2004, Parents indicated that in an effort to help the child's transition into the District's full day classes, they intended to have the child leave the District's school early on Wednesdays and Fridays, and that his progress would dictate when he could attend on a full time basis.

The District did not mail the IEP to the parents until September 1, 2004, and parents claim that they did not receive it until after the school year had commenced on September 8, 2004.  The committee's recommendation was: placement in a 12:1+2 special class during which time the child would receive 10 hours per week of discrete trial instruction (similar to ABA), two sessions of occupational therapy per week; individual speech therapy one time per week; group speech therapy three times per week; and parent training one time per month in a group.  Other technology services and devices remained the same as in the June 2004 IEP.

By letter dated September 22, 2004, the Mother indicated that the Parents' acceptance of the IEP was done on a "without prejudice" basis. *See IHO at 7, SRO at 6; District Exh. 13.*  In September of 2004 and through the school year, the Child continued to receive, at the Parents' expense, approximately 20 hours of ABA therapy at home as well as speech and language therapy twice a week for thirty minutes.  *Transcript at 1930-34.*  From September 15 - October

15, 2004, the Child bit people in the classroom six times.

The Parents requested an impartial hearing by letter dated November 1, 2004 and the IHO was appointed on November 4, 2004.  The Parents complained, *inter alia*, that the District: failed to provide extended day ABA instruction and support; failed to consider a full continuum of services for the child; failed to address adequately the child's performance levels; failed to develop specific supports for school personnel; failed to provide staff with appropriate training; failed to issue frequent progress reports; failed to give written notice for rejecting the Parent's requests; and failed to provided sufficient and appropriate related services.  Parents specifically sought reimbursement for 25 hours of home-based ABA per week, 10 hours of ABA supervision, 2 hours of parent training per week, team meetings and staff training, and 5 hours of individual speech-language therapy per week.

The hearing was conducted over the course of ten days from January 18, 2005 through May 24, 2005, and a decision by the IHO was rendered on June 26, 2005.  The IHO ordered that the "parents' request [] for reimbursement/funding for 25 hours a week of 1:1 home-based ABA, 10 hours a week of ABA supervision and consult for the ABA home program with overlap into the school program, 2 hours a week of parental training, team meetings on going staff training [sic] and 5 hours of 1:1 speech and language therapy is denied without prejudice." *IHO Decision at 44-45*.  The SRO affirmed the denial.

Plaintiffs claim that the July 16 IEP meeting was a sham, which deprived Plaintiffs of meaningful and genuine participation in the IEP development process, because Mamaroneck had impermissibly predetermined what services the child would receive at a private meeting without the child's parents present, conducted just minutes before the start of the July 16 meeting. They also claim that Mamaroneck failed to give appropriate "prior written notice" of the rejection for the requested services, as required by law, and that the parents did not receive their child's IEP until after the start of the school year. They contend that the District failed to provide an appropriate transition plan, as it failed to include the Parents' request for extended services after school, a 1:1 ABA aide in school and the inclusion of ABA home therapists in the new class for at least the start of the school year. *See IHO decision at 9.* They assert that the District's transition plan failed to consider the McCarton report of 2004, and the ABA home specialists, who provided 30 hours per week of direct services to the child in the Summer of 2004.

Parents contend that the District also failed to develop appropriate goals and objectives for the child's IEP, and that the Parents were effectively denied meaningful participation because the goals were unilaterally drafted by the District before the Parents were participating. They contend further that the District's IEP contained goals and objectives that were not sufficiently challenging.

Parents also contend that the District failed to timely perform a Functional Behavioral Assessment ("FBA") when the child starting hand-biting and scripting, early in the 2004-2005 school year, which constituted a denial of a FAPE. The District argued before the IHO that an

8

FBA was not required because the behaviors exhibited by the child did not impede his learning and that it was therefore not an essential element of the Child's program, but that it nevertheless conducted an FBA in January 2005, and developed a Behavioral Intervention Plan ("BIP").

The District argues that the educators and professionals involved in the development and implementation of the IEP for the child all agreed that an FBA was not required for the child prior to the promulgation of his 2004-2005 IEP, because his scripting and biting behavior in September and October of 2004 did not impede his learning. Plaintiffs contend that the school officials backdated certain documents to make it appear as though they acted more timely than they actually did.  Roni Kramer, the District's Assistant Director of Special Education, testified that the child's biting behavior occurred only during the first two weeks of school, but Susan Young, the School's autism consultant, testified that it started in mid-September and that there was no discussion of doing an FBA until mid-October, at which time they were more concerned with the child's scripting.  *Tr. at 407-408*.

*Discussion*

Under the IDEA, states that receive federal assistance must provide  "a free appropriate public education" to each student with a disability. *20 U.S.C. sec. 1400 (d)(1)(A)*. "When a state receiving IDEA funding fails to give a disabled child such an education, the child's parent may remove the child to an appropriate private school and then seek retroactive tuition reimbursement from the state."  *M.S. v. Yonkers Bd. of Educ.,* 231 F.3d 96, 102 (2d Cir. 2000), *citing School Comm. of Burlington v. Department of Educ.*, 471 U.S. 359, 369-70, (1985).

Initial determinations of the appropriateness of the IEP are made by the IHO and SRO, which "are then subject to 'independent' judicial review." *Walczak v. Florida Union Free School Dist.* 142 F.3d 119, 129 (2d Cir. 1998), *quoting Board of Educ. v. Rowley,* 458 U.S. 176, 205 (1982).  The Court "must examine the record for any 'objective evidence' indicating whether the child is likely to make progress or regress under the proposed plan." *Walczak at* 130.  "While federal courts do not simply rubber stamp administrative decisions, they are expected to give 'due weight' to these proceedings, mindful that the judiciary generally 'lack[s] the 'specialized knowledge and experience' necessary to resolve 'persistent and difficult questions of educational policy.'" *Id at 129* (*quoting Rowley at 206, 208*).


The inquiry for this Court in assessing a claim for reimbursement by parents for the supplemental services provided to their child is: 1) whether the IEP proposed by the school district was appropriate; 2) whether the private placement was appropriate to the child's needs; and 3) whether equitable considerations support the parents claim for reimbursement.  *See Frank G. v. Board of Educ. of Hyde Park,* 459 F.3d 356, 363 (2d Cir. 2006). The Court will examine each of these considerations in turn.


In determining whether the IEP proposed by the district was appropriate, the Court must determine "(1) whether the state complied with the procedural requirements of IDEA, and (2) whether the challenged IEP was 'reasonably calculated to enable the child to receive educational benefits.'" *Walczak.,* 142 at 129, *quoting Rowley,* 458 U.S. at 206-07.  As earlier noted, Plaintiffs

10

in this case contend that Defendant failed to meet both the procedural and substantive requirements of the IDEA.

The process to challenge an IEP and to obtain reimbursement for tuition first requires the parents to request an "impartial due process hearing" before an IHO appointed by the local board of education. *See* 20 U.S.C. § 1415(f); N.Y. Education Law § 4404(1).  It is then the School District's burden to show the appropriateness of its proposed IEP.  *Grim v. Rhinebeck Central School District,* 346 F.3d 377, 379 (2d Cir. 2004).  The IHO's decision may be appealed to an SRO, *see* N.Y. Educ. Law § 4402(2); 20 U.S.C. § 1415(g), and either party objecting to the SRO decision may bring a civil action in this court.  20 U.S.C. § 1415(i)(2).

*Procedural Defects and Predetermination*

Parents contend that the District deprived them of meaningful participation in the IEP process, by having "predetermined" their son's IEP for the 2004-2005 school year by entering the CSE meeting wtih a preconceived plan for the child's services; by recommending the child's placement or program before the development of the child's goals and objectives, and by failing to consider the full continuum of services available regarding extended day services and parent training.  While not all procedural errors render an IEP inadequate under the IDEA, it is well established that parents must not be deprived of meaningful participation in the IEP process and that where a procedural defect causes a substantive harm, a child is deprived of a FAPE.  *See e.g., Burlington*, 471 U.S. at 368 ("In several places, the Act emphasizes the participation of the

parents in developing the child's educational program and assessing its effectiveness.").

Susan Young runs an entity called the "Holistic Learning Center," which provides occupational therapy, special education, and ABA therapy in the office, but not in the home.  She is nevertheless the District's ABA supervisor and autism consultant. *See Tr. at 428.*  In support of the theory that the services planned for the child were predetermined, Plaintiffs point to a comparative chart or note of sorts, prepared by Young in her role as Mamaroneck's autism consultant, just moments before the July CSE meeting, which Young curiously did not attend. *See Pl. Exh. BB.*  This handwritten document lists in column-style comparison format the treatment and support "Recom. by McC," and next to those, the "School Respon."  As to the comparative chart, Young testified that the "school respons." category on her chart referred to the school's responsibility, as opposed to "response," because "she wouldn't just leave out an "e." *Tr. at 520, 522.*

Where Dr. McCarton recommended 12 months of schooling, the District responsibility was listed as 10 months; where Dr. McCarton recommended additional programs in the summer and holidays, the school responsibility was listed as 6 weeks; where Dr. McCarton recommended 25 hours of ABA at home (3 with a supervisor), the school responsibility was listed as 10 hours in school; where Dr. McCarton recommended 2 hours per week of parental support, the school responsibility was listed as monthly meetings; where Dr. McCarton recommended special education "K" w/ 1:1 aide, the school responsibility was special education "K" with ABA aide. There are other comparisons as well, including McC's recommendation for "Fast Forward" and

12

the school's responsibility listed as "not on IEP."

While Young attended the June IEP meeting, as noted above, she did not attend the July IEP meeting, as she felt she had "already written everything that [she] needed to present." *Id. at 431-432.*  This presumably includes the side by side comparison chart prepared before the meeting on July l6.  Although she was in Kramer's office on the morning of, and just before the July IEP meeting, which she had no intention of attending, Young denied that she discussed the chart's contents with Kramer that morning.  She also testified that prior to the July meeting, she met with Kramer and Peter "to talk about appropriate placement options and to look at staffing patterns and building different programs in different buildings to see what would be appropriate placements and staffing and training needs" and responded "yes," when asked whether the child's name came up at that meeting.  *Id. at 433-434.*

The services listed on the comparative list prior to commencement of the July IEP meeting, are just the services that the District ultimately provided, despite the Parents' protests and request for some at-home ABA services to aid in the child's transition and to ensure continued progress rather than regression.  While the Court is not oblivious to the difficult nature and necessities of planning and administration, it cannot conclude mere coincidence or that proper decision mechanisms resulted in the IEP's ultimate recommendation of 10 hours of in-school ABA services, the same "responsibility" listed by Young in contrast to McCarton's recommendation of 25-30 hours of home-based ABA.

13

While prior contemplation does not necessarily rise to the level of predetermination, the Court cannot ignore this evidence, which tends to show that the District did not come into the IEP meeting with an open mind, but rather predetermined at least one very significant component, namely the location and extent of ABA services that the District was willing to provide.  This failure precluded genuine individualization of the child's IEP and deprived the Parents of a meaningful opportunity to participate in the development of the child's IEP.  *See e.g. Deal v. Hamilton County Board of Education*, 392 F.3d 840 (6th Cir. 2004)(child was deprived of a FAPE where the school district did not come to the IEP meeting with an "open mind" and had predetermined the IEP as to the important component of ABA therapy, but held an IEP meeting to "listen" to the child's parents); *see also Frank G. v. Board of Educ. of Hyde Park*, 459 F.3d 356, 363 (2d Cir. 2006)(the IEP is to be *collaboratively* developed by the parents, educators and other specialists).  In this case, the District's predetermination deprived the child of a FAPE.

The Court additionally finds evidence of a procedural problem in that the child's placement and programs appear to have been determined before meaningful development and finalization of the child's goals and objectives.  As acknowledged by the SRO, witnesses "disagreed about the extent to which goals and objectives were developed or discussed at the June CSE meeting."  *SRO Decision at 5, citing Transcript*.  For example, Susan Young attended the June IEP meeting during which they "did not speak about specifics" but they "talked about whether or not there would be an appropriate placement in terms of the physical location, the staff ratio, the recommendations from the McCarton report" and that "goals were not ironed out

14

with percentages at that point." *Id. at 433-434.* That the goals and objectives were not established and thoroughly discussed at the June meeting comports with the parents' contention that the District impermissibly determined placement issues before the child's goals and objectives were developed, as does the fact that Young, Kramer and Peter had spoken of what would be appropriate placement before the July meeting development of goals and objectives. Kramer admitted that the June 2004 IEP, which she believed had been mailed to the parents, "would [have been] almost exactly the same except for the additional services that we put in for S. and any changes in the goals and objectives that we might have made." *Tr. at 359.*

This Court disagrees with the SRO, who "could not conclude that the student's placement and program were finalized prior to the development of goals and objectives" because while "both a program and placement were recommended at the June 11, 2004 CSE meeting, [] the student's program and services were later modified at the July 16, 2004 CSE meeting in response to petitioners' concerns regarding the student's ability to transition." *SRO at 10.* By Kramer's own testimony, the additional services added in July did not change the basic placement determined in June. Since the IEP mailed September 1 was basically the same as that developed at the June meeting, it can be fairly and reasonably inferred that there were placement recommendations that predated the finalization in July of the child's goals and objectives and this procedural defect also deprived the child of a FAPE.[1]

_____

[1] Because the Court finds this procedural defect in the development of the goals and objectives deprived the child of a FAPE, it declines to decide whether the goals and objectives were also substantively inadequate by virtue of being vague, not objectively measurable, or insufficiently challenging.

In relation to the District's denial of Parent's request to continue extended day services for the child, the SRO determined that the District's witness "testified credibly" that extended day services were not necessary for the Child to receive a FAPE, because he was provided an appropriate program during the school day. This Court disagrees, as set forth *infra*, and finds a substantive deficiency in the refusal to provide any extended day or at-home services to the Child who had theretofore made progress with the help of substantial time in ABA treatment each week, and who had exhibited difficulty with transitions, as is customary for autistic children and was true for this child.

As to parent training, Kramer testified that "it was our responsibility to provide monthly parent training and so we offered it as, you know, the way we offer it to parents." *Transcript at 222.* This rings of a failure to individualize the child's program. Although the IEP rings of minimalism in providing at-school group parent training for only one hour per month to the parents, and although there is some evidence of an impermissible policy as to "how" parental training is provided, the Court does not reverse the SRO's conclusion that the District's refusal to provide parental training at home was justified for the reason that the parents were already very knowledgeable about their son's circumstances. While the Court finds that rationale dubious in a case involving the changing and evolving needs of an autistic child, the record does not provide a sufficient independent basis on which the Court could determine that the District's refusal to provide any at-home parental training caused the child substantial harm, so as to constitute denial of a FAPE.

16

With respect to the remaining procedural issues raised by Parents, the Court agrees with the SRO's conclusions.  Parents were not seriously prejudiced by late receipt of the IEP, since by letter dated September 2, they already wrote of their intent to modify the District's plan, a copy of which they had not yet received by mail.  Nor did the District's procedural defect in failing to provide Parents with written notice and an explanation of the District's rejection of their requests for extended day services constitute denial of a FAPE for the child.

In this case, the predetermination of the child's IEP deprived the parents of meaningful participation in the IEP process, which along with other procedural defects caused substantial harm and deprived the child of a FAPE.

*Substantive IEP*

Parents primarily claim that the recommended services were inadequate to provide the Child with a FAPE, as they lacked a meaningful transition plan, and failed to offer the development of an FBA and BIP.

An FBA is required "for a student whose behavior impedes his or her learning or that of others."  *8 NYCRR 200.4(b)(1)(v)*.  When the 2004-2005 IEP was developed, the Child hadn't yet begun biting and the failure to include an FBA in the IEP on the basis of biting behavior was reasonable, as at that time his biting could not have interfered with his learning.  The Court

17

agrees with the SRO that an FBA was not required on the basis of the child's scripting behavior, which was not apparently a primary concern at the time of the IEP's formulation.  The District sought permission to institute an FBA as early as October 6, 2004, and the Court does not find that the child was substantively deprived of a FAPE for failure to earlier institute and FBA and development of a BIP.

As to a meaningful transition plan, Roni Kramer, who is, or was during relevant times, the District's Assistant Director of Special Education, chaired the June and July IEP meetings and during the impartial hearing in January 2005, she admitted that ten hours of discrete trial ABA was added because "they made the case that it was an important way for S.P. to learn." *Transcript at 100.*  The record reveals, as the SRO noted, that the child had difficulty with transitioning into new circumstances.  *SRO at 15; Dist. Exh. 1.*  The District had knowledge of the Child's difficulty with transitions, and the IEP containing no at-home ABA therapy failed to address the Child's individual needs.  Examining the evidence of record and giving due weight to the proceedings below, the Court cannot conclude that the child was likely to make progress under a plan that would bluntly change his routine, and in which no at home ABA therapy was provided, despite his being accustomed for the prior years provided with 30-35 hours per week of at home ABA services, and under which program he made meaningful advances.  *See Walczak, supra.*

The Court concludes that the IEP, which failed to include any transitional provisions for at-home ABA services, was not reasonably calculated to enable the child to receive an

18

educational benefit and deprived him of a FAPE.

*Retrospective Evidence*

Plaintiffs ask the Court to accept and consider the post-hearing deposition transcripts and certain progress reports from the end of the 2004-2005 school year, which reveal regression by the child in certain significant areas.  Defendant acknowledges that the Court is permitted to expand the administrative record in accordance with 20 U.S.C. § 1415(i)(2)(C)(ii), upon the request of a party, but argues that the reports constitute retrospective evidence not relevant to whether the July 2004 was reasonably calculated to provide the child with a free appropriate public education, and also argue that they are improperly submitted without additional evidence to place them in context.  *Rushfield Aff. at ¶¶ 15-17.*

Plaintiffs submitted the "Annual Review Special Education Teacher Report" by the Mamaroneck School District for testing conducted March 9, 2005, during his Kindergarten year, which indicated that while the child obtained a percentile rank of 75 in reading, he obtained a percentile rank of only 50 percent in spelling and very low rank of 16 percent for arithmetic.  *Pl. Exh. I.*  He showed weaknesses in comprehending short stories, his "spelling and math scores indicate delays in those areas," and he was unable to state the time when presented with a picture of a clock. *Id.*

The District's "Annual Review Speech-Language Report" dated April 27, 2005, indicate

that the child fell into the 5th percentile for Picture Vocabulary Test IIIB and into the 1st

percentile for both his Auditory and Expressive Communication Language skills. *Pl. Exh. J.*

While the Court does not purport to be an expert in the medical or educational fields, to

suggest that the Court cannot find contextual meaning in a statement such as "spelling and math

scores indicate delays in those areas" without testimony as to what that means is unavailing, and

the Court will in its discretion consider evidence relevant to its determinations, where that

evidence imposes no prejudice on the other party.

While these particular reports are not outcome determinative to the question of whether

the July 2004 IEP was reasonably calculated, and the Court does not rely on them for its

conclusion that the IEP was not reasonably calculated, the Court nevertheless points to these

results as confirmation that the IEP was insufficiently calculated to meet the child's needs.

*Reimbursement*

In order to award reimbursement under the IEP, the Court must also determine "that the

private education services obtained by the parents were appropriate to the child's needs."

*Walczak at 129.* "The test for the parents' private placement is that it is appropriate, and not that

it is perfect." *Warren G.V. Cumberland County School District*, 190 F.3d 80, 84 (3d Cir.

1999)(quoted by *M.S. v. City of Yonkers*, *supra*).

The parents have carried their burden of showing that the ABA services and speech and language services that they provided their child for transitional support and progress was appropriate, and the Court also concludes that the equities favor the Plaintiffs in this case. "[B]ecause the authority to grant reimbursement is discretionary, 'equitable considerations [relating to the reasonableness of the action taken by the parents] are relevant in fashioning relief.'" *Frank G.*, 459 F.3d at 363-364 (*quoting Burlington at* 374). The record evinces the Parents' good faith efforts to ensure an appropriate plan and transition for their child, and the District's failure both procedurally and substantively to ensure the same. Relevant to the Court's view on the equities, is the fact that the Parents were not uncooperative with the District, and did not disregard its recommendations or IEP's in their totality. Rather, as the adults indisputably best able to perceive their child's well-being and development, they sought programming supplemental to that which they did not challenge, so as to ensure some meaningful measure of consistency and to avoid any regression, in the inherently delicate and demanding effort of working for the development of their child challenged with autism.

Nor should the Parents have been expected to ignore the McCarton Center diagnosis and recommendation (to which the District paid lip service by adding 10 in-school ABA hours) for at least 25 hour of at home ABA therapy and greater 1:1 speech and language services. This was the Center for Developmental Pediatrics that had first known, diagnosed and sought to help the child, and it was only reasonable for the Parents and other professionals to fear that the District's plan to abruptly bring to a halt all at-home services would result in regression for the Child.

21

In light of the prior years' programs, which included intensive ABA services, and in consideration of the demanding nature of ushering an autistic child through his critically formative young years, these requests for transitional assistance were not grandiose or inappropriate.  Indeed, without purporting to be an expert in the field, the Court notes that it is widely understood that uniformity and routine are considered to be crucial components of the development of individuals with autism.

The Parents requests for modest supplemental programming to sustain the progress of the Child's theretofore intensive ABA services, when his educational circumstances were so appreciably altered between 2003-2004 and 2004-2005 was in no way unreasonable.  The Court finds that Plaintiffs acted reasonably in providing the supplemental ABA services for the child, which would afford him the best possible chance of not regressing, and of maintaining the developmental advancements that had thus far been achieved in the first years of this child's education.

*Conclusion*:

The totality of the circumstances in this case reveal that Defendant procedurally deprived Plaintiffs of the opportunity to participate meaningfully in the EIP process, and substantively deprived the child of a FAPE.  In contrast to *Grim v. Rhinebeck CSD*, 346 F.3d 1045 (2d Cir. 2003)*,* in which the Court of Appeals considered the procedural defects insufficient to warrant relief due to the "substantive propriety" of the IEP,  here the procedural defects were significant

and the IEP was also substantively insufficient.  The supplemental at-home ABA services and speech and language services provided by the parents were reasonable and appropriate, such that the parents should be reimbursed for them, according to the provisions and purpose of the IDEA.

Accordingly, Defendant's motion (Doc. No. 12) is denied.  Plaintiffs' motion (Doc. No. 15) is granted.  The parties shall attempt to agree on a proposed form of judgment, or settle a judgment on ten (10) days notice if unable to agree.  Plaintiffs' counsel shall submit his application for fees with the proposed judgment.

SO ORDERED.

Dated: White Plains, New York
          May 10, 2007

_____

Charles L. Brieant, U.S.D.J.

SO ORDERED.

Dated: White Plains, New York
        May 10, 2007

Charles L. Brieant, U.S.D.J.